1
         UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF VIRGINIA
2              ALEXANDRIA DIVISION

3  --------------------------x
   UNITED STATES OF AMERICA   :    Criminal Action No.:
4                             :    1:24-cr-125
        versus                :
5                             :    Thursday, October 17, 2024
   JOSE ALEJANDRO BELMONTE     :    Alexandria, Virginia
6  CARDOZO,                   :
              Defendant.      :    Pages 1-30
7  --------------------------x

8        The above-entitled motion to suppress was heard
   before the Honorable Leonie M. Brinkema, United States
9  District Judge.  This proceeding commenced at 9:01 a.m.

10            A P P E A R A N C E S:

11 FOR THE GOVERNMENT:    LAUREN HALPER, ESQUIRE
                          ZOE BEDELL, ESQUIRE
12                        OFFICE OF THE UNITED STATES ATTORNEY
                          2100 Jamieson Avenue
13                        Alexandria, Virginia  22314
                          (703) 299-3700
14
   FOR THE DEFENDANT:     TODD RICHMAN, ESQUIRE
15                        OFFICE OF THE FEDERAL PUBLIC DEFENDER
                          1650 King Street
16                        Suite 500
                          Alexandria, Virginia  22314
17                        (703) 600-0800

18 COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                          Official Court Reporter
19                        United States District Court
                          401 Courthouse Square
20                        Alexandria, Virginia  22314
                          (607) 743-1894
21                        S.AustinReporting@gmail.com

22      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

23

24

25
                                                          1

```
1                    TABLE OF CONTENTS

2                        WITNESSES

3    On behalf of the Government:

4    SARA OLIPHANT

5    Direct examination by Ms. Halper  .........5
     Cross-examination by Mr. Richman ..........11
6    Redirect examination by Ms. Halper .......22
     Recross-examination by Mr. Richman .......23

7

8                        MISCELLANY

9    Proceedings October 17, 2024 ..............3
     Certificate of Court Reporter ............30
10
```

Direct examination by Ms. Halper .........5
Cross-examination by Mr. Richman ..........11
Redirect examination by Ms. Halper .......22
Recross-examination by Mr. Richman .......23
Proceedings October 17, 2024 ..............3
Certificate of Court Reporter ............30

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

```
 1                    P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Criminal Number 1:24-cr-125,

 3    United States of America versus Jose Alejandro Belmonte

 4    Cardozo.

 5           Would counsel please note their appearance for the

 6    record, first for the government.

 7           MS. HALPER:  Good morning, Your Honor.  Lauren

 8    Halper and Zoe Bedell for the United States.

 9           THE COURT:  Good morning.

10           MR. RICHMAN:  Good morning, Your Honor.

11    Todd Richman for Mr. Belmonte Cardozo, who's present.

12           THE COURT:  All right.  And, again, your client

13    does not need an interpreter; correct?

14           MR. RICHMAN:  That's correct.

15           THE COURT:  All right.  This matter comes on the

16    defendant's motion to suppress.  And the only issue on the

17    motion to suppress is the search and seizure of the cell

18    phone; correct?

19           MR. RICHMAN:  Correct.

20           THE COURT:  You're not moving to suppress any of

21    the statements?

22           MR. RICHMAN:  Correct.

23           THE COURT:  All right.  I've had a chance to go

24    over the papers.

25           Is Officer Olifant here?
```

                                                            3

1          MS. HALPER:  She is, Your Honor.

2          THE COURT:  All right.  I'd like to hear from her.

3          MS. HALPER:  Yes, Your Honor.

4          THE COURT:  So let's call her to the stand.

5          MS. HALPER:  Yes, Your Honor.

6          The government calls CVP Port Intelligence

7    Officer, Sara Oliphant.

8          And, Your Honor, while she's making her way, I

9    would also let the Court know for planning purposes that the

10   government also has Computer Forensic Agent Christopher

11   Hall.

12         THE COURT:  I'm not going to need him, I don't

13   believe.  All right.

14         MS. HALPER:  Yes, Your Honor.

15         THE COURT SECURITY OFFICER:  Face the deputy

16   clerk.  Raise your right hand.

17   Thereupon,

18                    SARA OLIPHANT,

19   having been called as a witness on behalf of the government

20   and having been first duly sworn by the Deputy Clerk, was

21   examined and testified as follows:

22              (Time noted:  9:02 a.m.)

23         THE DEPUTY CLERK:  Thank you.

24         THE COURT SECURITY OFFICER:  You may be seated.

25              DIRECT EXAMINATION

4

Direct examination - S. Oliphant

```
1    BY MS. HALPER:

2    Q    Good morning, ma'am.  Can you please state your name

3    and spell it for the record.

4    A    Good morning.  My name is Sara Oliphant.  S-A-R-A.

5    Last name is O-L-I-P-H-A-N-T.

6    Q    How are you employed?

7    A    I'm currently employed with Customs and Border

8    Protection, and I'm assigned to Washington Dulles Airport.

9    Q    How long have you been employed in that capacity?

10   A    I've been there a little over five years.  Since July

11   of 2019.

12   Q    Can you briefly describe your duties and

13   responsibilities as a U.S. Customs and Border Protection

14   agent at the Dulles Airport?

15   A    Sure.  Right now I'm assigned to the port intelligence

16   unit.  CBP has a bunch of different roles, but for me

17   specifically, I review and analyze a lot of trends.  I've

18   been asked by management to focus solely on child sex abuse

19   material, as well as human trafficking and child sex tourism

20   and how it could relate to Washington Dulles Airport and how

21   we can apprehend violators at the border.

22            THE COURT:  How long have you been in that

23   position?

24            THE WITNESS:  That position, one year.

25            THE COURT:  One year?
```

                                                               5

Direct examination - S. Oliphant

```
 1              THE WITNESS:  Uh-huh.

 2              THE COURT:  Okay.

 3   BY MS. HALPER:

 4   Q    Do you have any particular training in child

 5   exploitation?

 6   A    Yeah.  I've taken a few trainings.  All CBP officers

 7   have to take an annual training regarding human trafficking,

 8   and it touches on child sex trafficking.  I've also taken a

 9   training through the National Counterdrug Training

10   Association on human trafficking that also touched on child

11   sex trafficking as well.  And then again part of my job, you

12   know, studying and analyzing trends, I'm reading a lot of

13   informational bulletins from CBP, as well as foreign and

14   domestic law enforcement partners and NGOs with respect to

15   child sex abuse material and child sex trafficking.

16              THE COURT:  Can you tell me exactly when you went

17   into that new position?

18              THE WITNESS:  It would have been September of

19   2023.

20              THE COURT:  So these events occurred in May of

21   2024.  So you had been in that new position for

22   approximately, what, eight or nine months?

23              THE WITNESS:  Roughly, yeah.

24   BY MS. HALPER:

25   Q    What is the Trafficking in Persons Report?
```

6

Direct examination - S. Oliphant

1    A    So that's a -- it's a diplomatic tool that's released

2    by U.S. Department of State annually, and it touches upon

3    human trafficking trends, as well as child sex trafficking

4    through various countries that have issues with that and

5    what they're doing to combat that.

6              So that is something I review, and I have reviewed

7    specific to Bolivia, which I've done research on.  And it

8    just shows that they continue having issues with human

9    trafficking trends, as well as child sex trafficking in that

10   country.

11   Q    So the Trafficking in Persons Report touches on Bolivia

12   as well as other countries that have problems with human

13   trafficking and child sex trafficking; is that correct?

14   A    Correct.  When you review the report, you can go in

15   country by country and read up specifically on whatever

16   you're looking for country-wise.

17   Q    Is that something that you would have reviewed since

18   taking your post in September of 2023 but before the search

19   of Mr. Belmonte in May of 2024?

20   A    It would have been, yes.

21   Q    What is the National Targeting Center?

22   A    The National Targeting Center is with Customs and

23   Border Protection.  It's our vetting center that screens all

24   inbound and outbound passengers and cargo for any threats

25   against the United States.

7

Direct examination - S. Oliphant

1  Q    Does it provide any guidance as to what travelers CBP

2  officers should be inspecting at ports of entry?

3  A    It does.  It releases information to the ports of entry

4  regarding those trends.  It can also send us leads for

5  inspections as well as targets that they want us to look

6  into.

7  Q    Now, as a port intelligence officer at Dulles, do you

8  receive reports from the National Targeting Center?

9  A    I do, yes.

10 Q    Do you receive reports for all subject matter or only

11 some subject matter?

12 A    All subject matter.

13 Q    And in particular, do you receive reports related to

14 human trafficking and child sex trafficking?

15 A    I do.

16 Q    And, in fact, are you the point of contact at Dulles

17 for reports on that subject matter specifically?

18 A    I am.

19 Q    Okay.  In May of 2024, did you receive -- I'm sorry.

20        In May of 2024, were you conducting a particular

21 operation at Dulles related to human trafficking and child

22 sex trafficking?

23 A    I was.  In May of 2024, we had gotten approval from our

24 management to run a special operation that was focusing on

25 the apprehension of child sex abuse material at the border.

8

Direct examination - S. Oliphant

```
 1   Alternatively, any travelers with nexus to child sex tourism
 2   and child sex trafficking and/or a nexus to human
 3   trafficking in general.
 4   Q    Now, in May of 2024 during that operation, did you
 5   receive a report from the National Targeting Center related
 6   to the defendant, Jose Belmonte Cardozo?
 7   A    I did.
 8   Q    And what information did that report contain?
 9   A    That report contains essentially a list of names that
10   have been gathered, and it would be inbound and outbound
11   travelers that have potentially suspicious financial data
12   that would be indicative of possible CSAM purchases.
13            (Reporter interrupted for clarification.)
14            THE WITNESS:  Child sexual abuse material
15   purchases.
16   BY MS. HALPER:
17   Q    Did you know where Mr. Belmonte was traveling from at
18   the time?
19   A    I did.  I could see that he was traveling from Bolivia
20   via way of Colombia.
21   Q    What did you do as a result of having received that
22   report?
23   A    Well, considering that we were doing that special
24   operation, I reviewed the report, I saw that he was going to
25   be traveling to Dulles when I was on duty, and then with my
```

9

Direct examination - S. Oliphant

1    knowledge and experience of child sex trafficking trends in

2    Bolivia, I decided to place a lookout and conduct an

3    inspection.

4    Q    Now, you've mentioned Bolivia being one of the factors

5    that led you to flag Mr. Belmonte for inspection.

6             Were there any other factors from your report that

7    led you to put in a lookout for Mr. Belmonte?

8    A    It would have been just the report, the fact that he

9    was coming in while I was on duty that day, our operation,

10   as well as travel history.

11   Q    What about the financial transactions you mentioned

12   being contained in the report, did that factor in at all?

13   A    It did.

14   Q    Okay.  And so after having received that report, did

15   you, in fact, place that lookout for Mr. Belmonte to go

16   through secondary inspection?

17   A    I did.

18   Q    Okay.  And did he ultimately present himself on May 8th

19   of 2024 for that inspection?

20   A    He did.

21   Q    When he presented himself for that secondary

22   inspection, did he have two iPhones?

23   A    He did.

24   Q    Were they in the on position when he presented himself?

25   A    Yes.

Cross-examination - S. Oliphant

```
 1             MS. HALPER:  I beg the Court's indulgence for just
 2   a moment.
 3                       (Pause.)
 4             MS. HALPER:  Nothing further, Your Honor.
 5             THE COURT:  All right.
 6             MR. RICHMAN:  Thank you, Your Honor.
 7                   CROSS-EXAMINATION
 8   BY MR. RICHMAN:
 9   Q    Good morning, Agent Oliphant.
10   A    Good morning.
11   Q    First I wanted to talk about that Department of State
12   report that you talked about.
13             You're aware that divides countries -- the
14   Department of State divides countries in that reporting into
15   three tiers; right?
16   A    Correct.
17   Q    There's a small tier, Tier 1, that's like the United
18   States, the Netherlands, a few other countries that meet
19   sort of best practices; right?
20   A    Uh-huh.
21   Q    And that's roughly 10 percent of the countries in the
22   world?
23   A    I'm not aware if it's 10 percent or not.
24   Q    It's about 20 countries; is that right?
25   A    I'm not aware.
```

Cross-examination - S. Oliphant

```
 1   Q    Okay.  Are you aware it's a small number of the total?

 2   A    I'm sorry?

 3   Q    Are you aware it's a small number of the total?

 4   A    Total of total countries in the world?

 5   Q    Yes.

 6   A    Sure.  Yes.

 7   Q    And similarly there's a Tier 3, which is sort of the

 8   worst, the countries that are the biggest concerns for human

 9   trafficking; right?

10   A    Yes.

11   Q    And that's also a relatively small list?

12   A    I'm not aware.

13   Q    All right.  But you've reviewed the report?

14   A    I've reviewed the verbiage of certain reports and their

15   concerns per country.  I'm not aware of how many countries

16   total are in each tier currently.

17   Q    Well, the Court can look at it obviously, it's online.

18   It's a public report; right?

19   A    Sure, it is.

20   Q    You're aware that for 2024, Bolivia is in tier 2?

21   A    Correct.

22   Q    Which is with the vast majority of the countries in the

23   world?

24   A    Perhaps.  I'm not sure.  I would have to rereview.

25   Q    Again, that's verifiable.
```

                                                                 12

Cross-examination - S. Oliphant

```
 1              So assuming I'm right that it's in Tier 2 and it's
 2   the same as most countries in the world, that level of
 3   suspicion would apply to almost all international travelers
 4   arriving at Dulles; right?
 5   A    It would depend on the country that they're coming
 6   from.
 7              THE COURT:  I'm sorry, you need to keep your voice
 8   up.
 9              THE WITNESS:  Okay.  Sure.
10              THE COURT:  That's the microphone.  Why don't you
11   lean a little closer to it.
12              THE WITNESS:  Got you.  No problem.  Thank you.
13   BY MR. RICHMAN:
14   Q    And it would apply to anybody coming off a flight from
15   such a country; right?  In other words, it's not just
16   citizens of that country, it would be U.S. citizens that are
17   on a flight from Bolivia, for example; right?
18   A    I don't understand your question.  Would you mind
19   repeating it?
20   Q    The suspicion relating to Bolivia that you're raising,
21   or to any other country that's similarly rated, would apply
22   to anybody getting off a flight from that country; right?
23   A    I suppose.  It would depend on the verbiage of the
24   report.  And I recall reading the report on Bolivia, and it
25   mentioning that Bolivia had increased rates of child sex
```

13

Cross-examination - S. Oliphant

```
 1   trafficking and I believe sex child tourism as well.

 2   Q    Increased compared to what?

 3   A    General trends, as far as I'm aware.

 4   Q    Higher than, say, Virginia?

 5   A    I'm unaware of that.

 6   Q    So you don't know if it gives any more suspicion than

 7   it would for everybody arriving in Virginia?

 8   A    Arriving from where?

 9   Q    From anywhere.  Because anybody traveling to Dulles is

10   traveling to Virginia; right?

11   A    Possibly.  Depending on their travel history or

12   depending on their plans.

13   Q    It's a fact if they're landing at Dulles they're

14   landing in Virginia; right?

15   A    Oh, correct.  Correct.

16   Q    So you don't know if Bolivia has a higher rate of CSAM

17   trafficking or child sex trafficking than Virginia?

18   A    I'm unaware.

19   Q    So you don't know if people coming from Bolivia have

20   any higher risk than every single person landing at Dulles;

21   right?

22   A    I'm unaware.

23   Q    Now, you mentioned receiving a report from the National

24   Targeting Center?

25   A    That's correct.
```

Cross-examination - S. Oliphant

```
 1   Q    That was a report from FinCEN; is that right?

 2   A    The direct report, no.

 3   Q    So do you know what -- where it originated from?

 4   A    I believe that's NTC's report, and they send me a

 5   direct report from the National Targeting Center.

 6   Q    Okay.  But you don't know where they got it from?

 7   A    I am aware.

 8   Q    But did they get it from FinCEN?

 9   A    I believe so, yes.

10   Q    Which is another federal agency; right?

11   A    I believe so, yes.

12   Q    And FinCEN was passing on something it had received

13   from another -- a private party; right?

14   A    To my knowledge, yes.

15   Q    A private party that was a payment app?  They ran a

16   payment app; is that right?

17   A    That's correct.

18   Q    And it reported a number of people that that company

19   had identified as sending money to accounts associated with

20   minors; right?

21   A    Correct.

22   Q    Did it say whether those people could even see whether

23   the accounts were associated with minors?

24   A    I don't believe so.

25   Q    Did that payment company to your knowledge have any
```

15

Cross-examination - S. Oliphant

1   insight -- any way of seeing what the payments were for?

2   A    The only insight they would have would be reading the

3   memo lines that are included with those payments.

4   Q    But they wouldn't have -- for example, this app isn't

5   where people would transfer images?

6   A    Correct.

7   Q    So no images were interdicted or seen?

8   A    No.

9   Q    The report didn't say that any had been?

10  A    Correct.

11  Q    The report didn't say that any witness had said these

12  were for CSAM-related purchases; right?

13  A    That's correct.

14  Q    It said that they were -- these short memo lines, some

15  of them said things like food and stuff?

16  A    Correct.

17  Q    That they found suspicious?

18  A    Correct.

19  Q    And Mr. Belmonte was one of the five people that they

20  identified in this report?

21  A    That's correct.

22  Q    Do you know how many transactions they had identified

23  associated with him?

24  A    No.

25  Q    The report was for about a five-month period in 2023;

Cross-examination - S. Oliphant

```
 1   right?

 2   A    Correct.

 3   Q    Do you know if his -- if the alleged activity that they

 4   found related to him was ongoing throughout those five

 5   months?

 6   A    Could you repeat that one more time?

 7   Q    Do you know if the alleged activity that they had

 8   related to him was ongoing throughout those five months?

 9   A    I'm unaware if it was ongoing or if it was a particular

10   charge.

11   Q    Like a particular day or two days?

12   A    Correct.

13   Q    It could be at the beginning of that time period;

14   right?

15   A    That's correct.

16   Q    So it could be one day in February 2023?

17   A    Correct.

18   Q    Which is 15 months before this, this incident at Dulles

19   Airport?

20   A    Whatever transaction it was, it would have been within

21   the report timeline.  Whenever that report covers, it would

22   have fallen in those dates, and whatever the math is between

23   that date and the inspection date, sure.

24   Q    Sometime between 10 and 15 months before the arrival at

25   Dulles; right?
```

Cross-examination - S. Oliphant

```
 1   A    Sure.  Yes.

 2   Q    And you don't know if it was -- you don't have anything

 3   to suggest it was ongoing after the end of that five-month

 4   period that was mentioned in the report; right?

 5   A    Not that I'm aware of, no.

 6   Q    You don't have anything -- you didn't have any

 7   knowledge that anything was ongoing as of May 2024?

 8   A    That's correct.

 9   Q    Did the report identify that any of the information --

10   that any of these transactions were transnational?

11   A    I don't believe so.

12   Q    So you didn't have any indication that, even in 2023,

13   that any of this related to transnational crime, even if it

14   did relate to crime?

15   A    Not from that report, no.

16   Q    So nothing in that report would indicate that it was

17   either ongoing in May 2024 or that it was related to

18   transnational crime; is that correct?

19   A    Considering I wasn't sure if those transactions were

20   made international, I had no way of knowing.

21   Q    And that was essentially -- the little information you

22   had about Bolivia that you had testified about, plus that

23   report, that's the totality of the information that led to

24   this lookout; correct?

25   A    Plus the enhanced enforcement posture we had during the
```
                                                                18

Cross-examination - S. Oliphant

1    month of May 2024, we pulled our resources to focus on

2    apprehension of child sexual abuse material and anyone with

3    nexus to child sex tourism.  So those were all factors that

4    were leading into that.

5    Q    Right.  The enhanced enforcement posture didn't have

6    anything to do with particularized suspicion about

7    Mr. Belmonte; right?  Other than the two items I just

8    listed, the Bolivia and this information in this report.

9    A    I believe it did.  We used the financial data as a

10   lead, and we stopped him particularly of running that

11   operation.  So we had interest, and we were reviewing that

12   list a little bit closer.

13   Q    Right.  But the data you had was these potentially

14   domestic, potentially not ongoing transactions?

15           THE COURT:  That's been asked and answered.

16   That's been asked and answered already.

17           MR. RICHMAN:  Okay.  Court's indulgence briefly.

18                   (Pause.)

19   BY MR. RICHMAN:

20   Q    Did the report have any information about what type of

21   device was used for these transactions?

22   A    No.

23   Q    It could have been a desktop computer?

24   A    I'm not aware if those peer-to-peer apps have a desktop

25   functionality.  I'm not aware of that.

                                                                19

Cross-examination - S. Oliphant

```
 1   Q     But it might, you don't know?

 2   A     Possibly.  In my experience, it's traditionally cell

 3   phones or tablets or things that have like an application.

 4   Q     It was tied to Mr. Belmonte by an IP address; right?

 5   A     I believe so.  I'm not 100 percent sure on that.

 6   Q     Okay.  And if it was an IP address, that's tied to a

 7   residence; right?

 8   A     Actually, I believe it was tied, from what I'm seeing,

 9   name and date of birth.  I don't know that there's reference

10   of an IP address in there.

11         MR. RICHMAN:  Okay.  Nothing further.  Thank you,

12   Your Honor.

13         THE COURT:  All right.  Well, based upon the

14   pleadings, I want to ask you a few questions.

15         So after you had the defendant go to secondary,

16   what exactly happened then?

17         THE WITNESS:  Once he was in secondary, I worked

18   with my partner, and we conducted a full bag exam, which is

19   pretty traditional when you come into secondary.

20         THE COURT:  Right.

21         THE WITNESS:  After that, we did find that he was

22   in possession of some coca products which are prohibited

23   into the U.S.  So my partner worked on the seizure portion

24   of taking those products.  I produced the subject with a

25   tear sheet which outlines our border search authority of
```

                                                            20

1    electronics and asked for his devices, which he turned over.

2    I also asked for the passcode.  I believe I had the subject

3    unlock the device for me, and then I wrote the passcode down

4    so in case the device locked, we were able to get back into

5    the device, and then I conducted my electronic search of his

6    devices.

7             THE COURT:  All right.  Now tell me exactly what

8    you did in that electronic search.

9             THE WITNESS:  Sure.

10            So the phone I put it into airplane mode and

11   disconnect Bluetooth and Wi-Fi.  When I'm conducting exams

12   for child sexual abuse material, I know based on my

13   experience that a lot of times this can be hidden in hidden

14   apps, whether it be like a vaulted app, or since he was

15   carrying an iPhone, in the hidden gallery of the iPhone's

16   photo gallery.  So that is the first place that I do look.

17            THE COURT:  So the first place you looked once you

18   disabled the Bluetooth and the other connectives was the

19   hidden?

20            THE WITNESS:  Well, it would be initially the

21   traditional photo gallery, that usually pops up when I click

22   the app, and then I toggle over to the hidden album and

23   check that.

24            THE COURT:  What did you find there?

25            THE WITNESS:  There I found several images of what

                                                              21

Redirect examination - S. Oliphant

```
 1    I believe to be prepubescent girls touching their genitals,
 2    and it was both videos and photos of that.
 3              THE COURT:  And how long from the time you first
 4    took possession of the cell phone and your seeing the first
 5    image that you would call child pornography?
 6              THE WITNESS:  It was fast.  It was two minutes.
 7              THE COURT:  Okay.  Any questions the government
 8    wants to ask?
 9              MS. HALPER:  Your Honor, not based on the Court's
10    questions, but very brief redirect based on counsel's.
11                         REDIRECT EXAMINATION
12    BY MS. HALPER:
13    Q    Officer Oliphant, there was a question about items that
14    you saw in the memo lines of some of these transactions in
15    the report.
16    A    Correct.
17    Q    Okay.  Was one of the memo lines related to "Snap"?
18    A    Yes, it was.
19    Q    Okay.  And does Snap have any significance to you in
20    your training and experience?
21    A    Yes.  In my experience, Snap can be used shorthand for
22    Snapchat.  In my experience working with child sexual abuse
23    material, I know that CSAM can heavily be elicited from
24    Snapchat.  I see that quite frequently.
25    Q    And did that memo line, the Snap and what you've just
```

                                                              22

1    testified to about how it's significant to you, did that

2    factor in at all to your decision to place that lookout for

3    Mr. Belmonte?

4    A    Yes, it did.

5    Q    Okay.  You were asked about transnational crime and

6    indication in the report of any transnational crime.

7    A    Uh-huh.

8    Q    The report was about suspicious payments related to

9    child sexual abuse material; is that correct?

10   A    Correct.

11   Q    Okay.  And now importing or bringing in child sexual

12   abuse material into the United States from a foreign

13   country, that is, in fact, a transnational crime; is it not?

14   A    That's correct.

15        MS. HALPER:  Okay.  Nothing further.  Thank you.

16        THE COURT:  All right.  Mr. Richman.

17        MR. RICHMAN:  I just have one question.

18                    RECROSS-EXAMINATION

19   BY MR. RICHMAN:

20   Q    You said there was a reference to Snap in that report.

21   A    Correct.

22   Q    Do you know what individual that reference related to?

23   A    No.

24   Q    And there were a bunch of individuals referred by Cash

25   App to FinCEN to CBP; right?

23

Recross-examination - S. Oliphant

```
 1   A    I believe there were five total.

 2             MR. RICHMAN:  Okay.  Nothing further.

 3             THE COURT:  Anything further for the officer?

 4             MS. HALPER:  No, Your Honor.

 5             THE COURT:  All right.  Thank you.  You may step

 6   down.

 7             THE WITNESS:  Thank you.

 8                  (Witness excused at 9:24 a.m.)

 9             THE COURT:  All right.  Anything further from the

10   United States?

11             MS. HALPER:  No, Your Honor.  As I mentioned,

12   there is the forensic agent present here who would be in

13   response to testimony that defense would elicit.

14             THE COURT:  Yeah.  I mean, I read the proffered

15   testimony, it's part of the record, but I don't need to hear

16   anything further in that respect.

17             Mr. Richman.

18             MR. RICHMAN:  The only thing further -- you know,

19   obviously we would ask for his declaration to be admitted.

20   The government stated in its position yesterday that they

21   dispute that the information on the phone is encrypted.  We

22   would present additional information through our expert

23   about that if the Court questions that.

24             THE COURT:  I don't think it's relevant because

25   I'm -- I can tell you right now, I've spent some time going
```

24

1    over this record very carefully.  And it's an interesting

2    issue because you have the interplay of the *Riley* case which

3    is the Supreme Court making it quite clear that, in our

4    modern society, cell phones have achieved a level of

5    intimate connection to human beings, such that they are, I

6    think these days, a fairly specially protected device.

7            At the same time, they're also infamously involved

8    in criminal activity.  So there's that consistent balancing

9    that goes on in the criminal justice system between, you

10   know, the rights of privacy and the concerns that, you know,

11   the Constitutional protections of privacy, primarily in the

12   Fourth Amendment, are adhered to, and yet the genuine need

13   for law enforcement to be able to have access to these

14   devices.  So clearly, you know, *Riley* establishes a new

15   concern.

16           And then the *Kolsuz* -- K-O-L-S-U-Z -- I can't even

17   pronounce that name, but that case from the Fourth Circuit I

18   think is very, very instructional, because we talk about,

19   you know, routine versus non-routine border searches.

20           So we start with the first premise that, you know,

21   border searches are an exception to the warrant requirement.

22   When a person is entering the United States, you know,

23   coming through a border, they have much less expectation of

24   privacy than they would have at other locations.  And of

25   course the *Riley* case did not involve a border search.  But

                                                              25

```
 1    the Fourth Circuit in looking at Riley has developed sort of

 2    a new approach I think to border searches.

 3            But what Judge Harris wrote in that opinion -- and

 4    I think that is the critical issue -- is that after Riley, a

 5    forensic examination of a cell phone must be considered

 6    non-routine border search requiring -- and this is a

 7    quote -- "some measure of individualized suspicion."

 8            I'm satisfied, based on the evidence in this case,

 9    that Officer Oliphant did have some measure of

10    individualized suspicion.  It's not enough for probable

11    cause, but she clearly knew, Number 1, that the defendant

12    was coming from a country that does have some connection

13    with child sex trafficking and child sex tourism.

14            Now, again, it has some.  The evidence is

15    apparently -- and I haven't seen this report, but I'll

16    accept the evidence unless the government objects, that it's

17    in the second tier where probably the majority of the

18    countries in the world had.  Nevertheless, it's still in an

19    area which would lead a reasonable officer to have some

20    concern.

21            The additional -- but that fact alone would not

22    have been enough here.  But the additional fact, again, is

23    that you also have this defendant's name appearing on a

24    particular alert, which is apparently a standard type of

25    alert system for law enforcement.
```

26

1          Now, again, it's not the world's most specific,

2    but you have the confluence of these two facts, plus you

3    have -- although I don't know how critical it is -- the fact

4    that apparently in May, unconnected to targeting your

5    client, Mr. Richman, the customs folks had decided to make

6    May a particular month, the way sometimes you know, you see

7    DWI enforcement months when the police have an increased

8    presence to making sure that the law is being followed.  So

9    we have these three factors, which I think are enough to

10   establish that there was some individualized suspicion as to

11   this defendant.

12          Then you have, in addition, the fact that the

13   nature of the search -- and there's no evidence that is --

14   in this record that conflicts with this, is that it was

15   about two minutes.  That's all it took.

16          Now, from the first time the officer sees that

17   first picture of what appear to be minors touching each

18   other, I mean, which would certainly constitute child

19   pornography at this point, there's probable cause to then

20   conduct what we -- the second search, which is the more --

21   we haven't heard evidence about that, but it's in your

22   record, and I don't think it was disputed.

23          MR. RICHMAN:  Right.  There's no dispute about

24   that point forward.

25          THE COURT:  Right.  That there's a second search.

                                                              27

1          Now, again, the government has characterized both

2    of these as non-forensic searches.  I don't have to get into

3    that.  The point is, the second search, which is longer and

4    in more depth, whether it used Cellebrite or some other

5    device I don't really think is relevant here, they had

6    probable cause.

7          And then it goes to the more extensive clearly

8    forensic evaluation.  And there, those agents had more than

9    enough.  They didn't need a warrant at that point; they had

10   probable cause up the kazoo.

11         I would also note that unlike the facts in the

12   *Kolsuz* case, this case was not a case of somebody leaving

13   the country; they're coming into the country, which I think,

14   to some degree, has more impact, in my view, because it

15   means that some material that violates our law is coming

16   into the United States rather than the guns going out of the

17   United States.

18         MR. RICHMAN:  Well, I argued that to the Fourth

19   Circuit in *Kolsuz* and didn't win on that --

20         THE COURT:  I know.

21         MR. RICHMAN:  -- they said it's the same.  But I

22   get Your Honor's point.

23         THE COURT:  Also in *Kolsuz*, there was a much

24   longer time period that went on.  It was a couple months

25   they held the phone and did the long search.  The more

28

```
 1   intense, the final search, comes with the next day, as I
 2   understand, right, May 9, the second day, or May 8, but it
 3   was the day after.
 4           So based on the totality of the evidence before
 5   the Court, I'm finding that Officer Oliphant had sufficient
 6   basis to do the search that she did.  It was a de minimis
 7   search in terms of the length of time, and she went right to
 8   photos first and then the hidden photos.  So it wasn't like
 9   she rummaged through the entire phone.  At least that's the
10   evidence that we've got.
11           Even if I'm wrong and the Fourth Circuit were to
12   find that's not enough reasonable suspicion, I think in this
13   case, much like in the Kolsuz case, this officer would have
14   had protection of the good faith protection.  Because,
15   again, everything that I see here is good law enforcement
16   practice.  Again, it was not an extensive search.  She
17   didn't -- after those first two minutes, didn't sit there
18   and do a two-hour rummage through the phone.
19           But, anyway, I'm satisfied in this case that there
20   is no Fourth Amendment violation, so I'm going to deny the
21   motion to suppress.
22           And I don't know whether that makes any difference
23   into whether this case is going to go to trial or not.  We
24   need to get that worked out.  There may be a conflict with
25   that trial date, so I want to make sure that if you're going
```

```
 1    to resolve it, we resolve it soon.

 2            MR. RICHMAN:  I mean, I think it largely depends

 3    on if the government is going to allow us to resolve it in

 4    some ways that allows us to preserve our appellate rights,

 5    otherwise I think we may have some sort of --

 6            THE COURT:  It's a fairly normal practice when a

 7    motion to suppress is denied for the government to allow a

 8    defendant to enter a conditional plea.  I would hope that

 9    the government would seriously think about that.

10            MR. RICHMAN:  That would certainly -- I think that

11    would be our preference.  If it's permitted otherwise, we

12    would try to do as abbreviated of a trial as we could.

13            THE COURT:  One of those bench trials.  Okay.

14            Very good.  Anything further on this case?

15            MS. HALPER:  No, Your Honor.  Thank you.

16            THE COURT:  No.  All right.  Then we'll recess

17    court until 10:00.

18                 (Proceedings adjourned at 9:33 a.m.)

19                 ----------------------------------

20    I certify that the foregoing is a true and accurate

21    transcription of my stenographic notes.

22

23                           _____

24                           Stephanie M. Austin, RPR, CRR

25
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894